UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SKYLER J. SUCHODOLSKI                                    Case No. 1:17-cv-01113-AC

                              Plaintiff,                 OPINION AND ORDER

              v.

COLETTE S. PETERS, Director of
Department of Corrections; MICHAEL
GOWER; CHARLES SCOTT GRAHAM,
M.D.; OREGON DEPARTMENT OF
CORRECTIONS; CHRISTOPHER
DIGIULIO; MARK JUNGVIRT; DANIEL
DEWSNUP, M.D.; HEIDI A.
MONTGOMERY, NP; SEAN ELLIOTT,
NP; THOMAS BRISTOL, M.D.; MARK
NOOTH; STEVE BROWN; BRENDA
JOHNSON,

                              Defendants.
_____

ACOSTA, Magistrate Judge:

*Introduction*

       Plaintiff Skyler J. Suchodolski ("Suchodolski"), an inmate in the custody of the Oregon

Department of Corrections ("Department") currently housed at the Warner Creek Correctional Facility ("Warner Creek") who is appearing *pro se*, filed this Section 1983 action alleging violations of rights protected by the Eighth and Fourteenth Amendments. Suchodolski names Colette S. Peters, Director of the Department ("Peters"); Michael Gower, Assistant Director of the Department ("Gower"); Christopher DiGiulio, M.D., Deputy Medical Director of the Department ("Dr. DiGiulio"); Mark Jungvirt, Interim Health Services Administrator of the Department ("Jungvirt"); Mark Nooth, Eastside Institution Director for the Department ("Nooth"); Steve Brown, Warner Creek Superintendent ("Brown"); Brenda Johnson, Executive Support Specialist 1 for the Department ("Johnson"); Daniel Dewsnup, M.D., Therapeutic Level of Care Committee ("Committee")[1] member ("Dr. Dewsnup"); Thomas Bristol, M.D., Committee member ("Dr. Bristol"); Heidi A. Montgomery, Committee member ("Montgomery"); Sean Elliott, Committee member ("Elliot"); and Charles Scott Graham, M.D. ("Dr. Graham")(collectively "Defendants") as defendants.

Currently before the court are the parties' cross-motions for summary judgment. The court finds Suchodolski failed to establish the level of care provided by Defendants violated his rights under the Eighth Amendment. Additionally, Suchodolski failed to identify the existence of a right or interest entitled to protection under the Fourteenth Amendment or Defendants deprivation of such right. Accordingly, Defendants' motion for summary judgment is granted and Suchodolski's motion for summary judgment is denied.[2]

---

[1]The Committee is a "group of medical professionals who oversee inmate healthcare" for the Department. (DiGiulio Decl. dated April 20, 2018, ECF No. 30 ("DiGiulio Decl.") ¶ 6.)

[2]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

While weightlifting on October 19, 2016, Suchodolski felt a "warm/burning tearing sensation in [his] right lower abdominal/groin area." (Suchodolski Decl. dated December 27, 2017, ECF No. 22 ("Suchodolski Decl."), ¶ 1.) The following day, a nurse examined Suchodolski, provided education on muscle sprains and strains, suggested the use of Tylenol for pain, and recommended Suchodolski avoid weight lifting. (Pl.'s 42 U.S.C. § 1983 Ex. List, ECF No. 24 ("Ex. List"), Exs. 1, 2.) On October 24, 2016, Suchodolski reported continued pain to the nurse, which now included discomfort in his right testicle, and was scheduled to see a physician on November 23, 2016. (Suchodolski Decl. ¶¶ 6, 8; Ex. List Ex. 2.) Suchodolski missed his November 23, 2016 appointment and did not attempt to reschedule as his symptoms appeared to alleviate with rest. (Suchodolski Decl. ¶¶ 9-11; Ex. List Ex. 2.)

Suchodolski resumed weightlifting and, in late February, 2017, felt a "pop" and a warm, burning sensation in his lower abdominal area while performing "deadlifts." (Suchodolski Decl. ¶¶ 12, 13.) Suchodolski reported the injury to a nurse, who scheduled an appointment with a physician. (Suchodolski Decl. ¶ 13.) On March 1, 2017, Dr. Graham examined Suchodolski and noted Suchodolski:

> is tender in the right lower quadrant area just above the ilio inguinal ligament, he has no tenderness at the external inguinal ring, it is more between the external and internal ring, his testicles were descended bilaterally, he has no evidence of a hernia on exam but he does have pain in that area, he said once in a while he will get a little tiny bump about the size of the end of his finger. I feel an obvious defect.[3]

(Ex. List Ex. 3.)

---

[3]Dr. Graham later explained the notes should read "I feel no obvious defect at this time" and attributed the error to a "clerical issue." (Ex. List. Ex. 66.)

Dr. Graham diagnosed Suchodolski with the "possibility of a beginning of a slight inguinal hernia versus ilio inguinal strain" and recommended Suchodolski limit his squats and deadlifts to reduce strain to the area. (Ex. List Ex. 3.) Dr. Graham agreed to refer Suchodolski's request for an ultrasound to the Committee, but expressly noted "there are no signs of strangulation or incarceration or even any sign of a definite hernia in the site." (Ex. List Ex. 3.) On March 2, 2017, the Committee denied the request for additional testing, recommending conservative care and clinical follow-up for development of a hernia. (Ex. List Ex. 4.)

Suchodolski filed a grievance on March 9, 2017 (the "First Grievance"), claiming Dr. Graham mishandled his diagnosis and submitted an inaccurate referral to the Committee, and requesting a proper examination. (Ex. List Ex. 5.) Barbara Fitzpatrick, R.N. ("Fitzpatrick") denied the First Grievance on March 15, 2017, explaining that while Dr. Graham acknowledged Suchodolski's pain, there was no definitive signs of a hernia and no evidence of a serious medical issue. (Ex. List Ex. 6.) Two days later, Suchodolski reported an increase in pain and requested another evaluation by a physician, which was scheduled. (Ex. List Ex. 3.) Suchodolski appealed the denial of his First Grievance on March 27, 2017 (the "First Appeal"), again seeking "proper medical care and a further examination." (Ex. List Ex. 7.)

Dr. Graham examined Suchodolski again on April 5, 2017. (Ex. List Ex. 11.) His chart notes provide:

> **Subjective**: Patient comes in [to] discuss his right inguinal pain and possible hernia. I had evaluated him on March 1, 2017[,] and I did not feel a hernia present during that exam. He does have possibly a little bit of weakness in that area or prominence with Valsalva on the right versus the left. He said he continues to have pain anytime he does any lifting, bending over he will have pain. He actually describes it as this thing that pop[s] out and he will push it back in and it will pop out and he will push it back in, it just depends on what he is doing. No left-sided symptoms. He is here

really to discuss further evaluation and possible ultrasound or other modalities to evaluate for a hernia for potential repair. He gives a history of that if it does come out, he is able to push it back in which to me shows no signs of strangulation or incarceration. He has no urinary symptoms, he is able to function at the capacity of the institution; Just getting up, moving and going to chow. He said he has also stopped lifting weights.

**Objective**: Blood pressure, 141/67, pulse 83, SATS 95% on room air, weight 190 pounds; GENERAL-23 year old male, he is alert and awake, abdomen is soft, with Valsalva standing there is a slight bulge or fullness on the right more than on the left, even with Valsalva and coughing, bearing down I do not feel any inguinal hernia, there is nothing herniated through the external inguinal ring, the left side is normal, there's a little more bulging on the right side than the left side. He was not able to reproduce this true herniation that he describes so that I can't evaluate that or reduce it.

**Assessment**: right inguinal strain without evidence of a hernia present.

**Plan**: I don't think an ultrasound or CT scan at this point would change my plan of care and obviously there is not a large hernia that is becoming strangulated or incarcerated. I am unable to get him to reproduce the true herniation during the exam. TLC has reviewed this case and they recommended continued monitoring of his symptoms and evaluation. If there's any changes in his symptoms or problems he can always be reevaluated and reassessed at any time. He will follow up on an as-needed basis or if there's any changes he will be seen at any time.

(Ex. List Ex. 11.) On April 6, 2017, Suchodolski failed to appear for triage with the nurse. (Ex. List Ex. 8.) On April 7, 2017, Suchodolski sought clarification of his diagnosis and treatment plan, explaining his "bunkie" had a hernia repair while incarcerated in another Department facility which did not require review or approval by the Committee. (Ex. List Ex. 8.)[4]

---

[4]Suchodolski submitted another grievance on April 17, 2017 (the "Second Grievance"), asserting Dr. Graham "is acting with deliberate indifference to a serious medical need" and requesting "the proper scans and tests [be] ordered so the proper medical treatment of surgery can be obtained so that I can return to my normal daily activities without struggling thru pain." (Ex. List Ex. 12.) The Department rejected the Second Grievance on April 19, 2017, advising Suchodolski it appeared to be duplicative of the First Grievance and inappropriate under Rule 109, which prohibits inmates from grieving a matter in more than one grievance form. (Ex. List Ex. 14.) Suchodolski appealed the rejection of the Second Grievance on April 20, 2017, and the appeal was rejected on April 21, 2017. (Ex. List Exs. 19, 23.) Suchodolski appealed the rejection of the Second

In a letter dated April 17, 2017, Dr. DiGiulio effectively denied the First Appeal. (Ex. List Ex. 13.) Dr. DiGiulio referenced the Department's Health Services Section Policy and Procedure #P-A-02.1 (the "Policy"), which he explained "addresses the level of therapeutic care provided by [Department] health services," and concluded Suchodolski's "current concerns would fall under the category of Level 3 'medically acceptable but not medically necessary' for which treatment is authorized on a case[-]by[-]case basis." (Ex. List Ex. 13.) Dr. DiGiulio informed Suchodolski:

> based on the findings of your examination, Dr. Graham and the [Committee] have determined a higher level of care is not medically indicated or necessary at this time. It is understood that you are/may experience discomfort as a result of this injury. Health Services will work with you to minimize this; your part is to avoid activities such as weightlifting that cause further strain to the area. Please continue to work with the medical staff at [Warner Creek] to address future medical needs.

(Ex. List Ex. 13.) Two days later, Suchodolski appealed the denial of the First Appeal (the "Second Appeal"), representing he had been diagnosed with an inguinal hernia and asserting failure to treat a hernia, no matter how slight, is deliberately cruel. (Ex. List Ex. 17.)

Suchodolski reported continued pain on April 24, 2017, and his "hernia" popped out again on April 28, 2017 (Ex. List Ex. 11.) In early May, 2017, Suchodolski complained to a nurse of a sharp, burning pain in his right inguinal area which prevented him from completing his bowel movement on at least two occasions. (Ex. List Ex. 38.) Suchodolski explained the pain was getting worse and he was experiencing anxiety as a result of his condition. (Ex. List Ex. 38.) He was still lifting weights but not doing "squats" or "deadlifts," and had pain when doing sit ups or even just tying his shoes. (Ex. List Ex. 38.) The nurse recommended increasing fluid intake to reduce the

---

Grievance for a second time on April 22, 2017, which was again rejected on April 24, 2107. (Ex. List Exs. 26, 29.)

need for straining during bowel movements and decreasing manipulation of the area with his fingers, and educated Suchodolski on splinting the area, if necessary. (Ex. List Ex. 42.)

On May 10, 2017, the Committee reviewed a request for a second opinion by a Department physician, again agreed with Dr. Graham's evaluation, and recommended Suchodolski be followed clinically. (Ex. List Ex. 44.) In a letter dated May 17, 2017, the Department denied the Second Appeal, explaining:

> [t]here is no documentation in your medical file from Dr. Graham diagnosing you with an inguinal hernia. As explained to you previously, Dr. Graham[']s notes of March 1, 2017[,] state that you have the possibility of a beginning of a slight hernia versus an ilio inguinal strain. You were recently re-evaluated on April 5, 2017[,] by Dr. Graham. Based on the findings of that examination, the diagnosis on April 5, 2017, was right inguinal strain without evidence of a hernia present.
>
> Health Services is in no way denouncing your concerns. However, based upon the findings of your physical examinations to date, continued observation and conservative care are recommended by the [Committee]. In addition, as Dr. DiGiulio explained in his response to your grievance appeal, your medical issue is currently a level 3 category, meaning that a higher level of care is not medically necessary at this time.
>
> Health [S]ervices will continue to monitor your condition for changes or for any indication that further work up is warranted. It is important for you to avoid activities which cause further strain or injury to the area. Health Services understands that avoid those activities may require a lifestyle change; the decision to make those life style changes to avoid further injury is up to you.

(Ex. List Ex. 48.)

In early June 2017, Suchodolski reported an increase in pain "from the root of the right testicle" up to the abdomen despite "resting," eliminating "squats or heavy lifting," and just "trying to take it easy." (Ex. List Ex. 46.) At Suchodolski's request, the nurse scheduled another appointment with Dr. Graham, which occurred on June 21, 2017. (Ex. List Ex. 46.) Dr. Graham's chart notes from the June 21, 2017 examination provide:

**Subjective**: Patient comes in to be reevaluated for his lower abdominal pain. He is still concerned that he might have an underlying hernia. He points to just above the base of his penis at the suprapubic area in regards to where he feels pain. He says when he bears down he feels a bulge. He did come in and see Nurse Erickson in April, and he was evaluated. There was no evidence of a bulge at that time. He denies any bowl or bladder issues, but he does have pain in this area. He says he wouldn't be into medical if it wasn't bothering him; he says that he has a lot better things to do than come to medical. Apparently, this has been an ongoing issue since 2015. At that point he was doing quite a bit of heavy lifting. He denies any back pain or lower extremity problems. It is just kind of in that one spot. When asked more about his lifting practices and what he does – he said he hasn't been doing any lighting except for his own body weight since he was advised against strenuous/heavy lifting. He said he has been doing squats with his own body weight. He said he's even taken extended periods of time off the weight pile to rest it, and it sill continues to bother him. I have sent this to [the Committee] for review a couple different times, and basically they recommended that I continue to evaluate him for any changes.

**Objective**: BP – 133/64, pulse 78, SATS 99% on room air, weight 185lbs; General – 23 year-old male, he is alert and awake and in no acute distress, he ambulates in without any abnormal limps or problems; HEENT – show conjunctiva to be non-pale, heart is regular, lungs are clear, abdomen is soft; Standing Exam: he is a normal, circumcised male. There is no obvious bulge, even when he Valsalva's or strains, I do not see a bulge. On both right and left a little bit of a bulge is noted at the pyramidalis and the lower rectus abdominal muscles when he does strain. There is no abnormality in his right inguinal ligament area. Even with Valsalva, there is no hernia palpable. There is nothing on the left side. He has no testicular masses or enlargement. There are really no abnormal findings on this exam.

**Assessment**: 1. Lower abdominal pain, possibly with a rectus abdominal muscle strain due to old injury and/or heavy lifting.

**Plan**: At this point, I haven't found any evidence of incarceration, strangulation, or even a hernia. At this point on exam, I am not exactly sure what is going on. It has been going on for over 8 months, so I can reassure him that there is nothing serious going on. I talked to him about resting it more. Giving this prolonged rest for another six to eight weeks should be worthwhile and not even doing any squats with his own body weight. We sill continue to monitor him, and if there are any changes, we will re-evaluate and make further recommendations as indicated.

(Ex. List Ex. 58.)

A month later, Suchodolski reported continuing pain, discomfort, and pressure. (Ex. List Ex.

58.)  Suchodolski commented he was trying to avoid strenuous activity and use only body weight when lifting.  (Ex. List Ex. 58.)  "If I back it to light it may go away which I've been trying to do. The provider said it was a strain so that's what I'm doing." (Ex. List Ex. 58.)  Dr. Graham examined Suchodolski again on August 16, 2017, and reported:

> **Subjective**:  Patient comes in to continue to discuss his right groin kind of inguinal discomfort.  He does admit that he's finally stopped (about a week ago) getting on the weight pile and stopped doing bench pressing and other weight[-]related activities.  His pain is still present.  It is almost like an ache.  He notices it when he gets up and out of his top bunk, and it bothers him.  He does not feel any bulge at this time.  He denies any burning or pain with urination; it is almost like he gets relief after he empties his bladder.  He doesn't have any back pain.  It is still very discomforting to him, and it just hasn't gotten any better with time and rest.  No bowel or bladder issues.

> **Objective**:  BP – 146/77, pulse 84, SATS 98% on room air, weigh 195lbs; General – 23 year old male, he is alert and awake, he is in no acute distress, he ambulates in and out of the exam room without difficulty; HEENT – is unchanged, abdomen is soft, non-tender in his entire upper and lower quadrants, he is tender right in the mid ileal inguinal ligament, near the femoral canal.  He has no evidence of a femoral hernia that is causing any paresthesias on his right anterior thigh.  Normal GU exam, he is a normal circumcised male.  Once again, he was evaluated for a hernia.  There was no testicular masses or enlargement.  There is no hernia present.  With val-salva, there was no bulge or herniation noted.  He seems to just be tender in the distal 1/3 or the ileal inguinal ligament, maybe near the femoral canal.

> **Assessment**:  1.  Right lower quadrant inguinal pain, which is possible due to an ileal inguinal strain without evidence of a hernia.

> **Plan**:  After going back and reviewing the charts, I really feel that there has been no change in the exam.  Of note, I feel that there was a clerical misprint going back to the dictation of March 1st, 2017, when I first evaluated him.  His exam had no evidence of a hernia.  He did have some pain in the area, but there was a statement that I said "I feel an obvious defect," but it should say "I feel no obvious defect at this time."  This is basically a clerical issue.  I recommend he continue to stay off the weight pile at this time.  This will help him give it more time to heal.  A second opinion by a different provider may need to be entertained at some point if this continues to not improve.  There is no indication of a low bunk.

(Ex. List Ex. 66.)

In the Amended Complaint filed September 25, 2017[5] (the "Complaint"), Suchodolski alleges Peters, Gower, Dr. Graham, Jungvirt, Dr. Digiulio, Dr. Bristol, Dr. Dewsnup, Elliott, and Montgomery (collectively "Medical Defendants") violated his Eighth Amendment right to be free from cruel and unusual punishment by refusing to provide medical treatment for serious pain and discomfort from his right lower inguinal area, and resulting anxiety. (Am. Compl. ECF No. 12, at 4-15.) Additionally, Suchodolski alleges Peters, Gower, Jungvirt, Dr. Digiulio, Dr. Graham, Dr. Bristol, Dr. Dewsnup, Elliott, Montgomery, and Brown (collectively "Due Process Defendants") violated his Fourteenth Amendment right to due process by relying on an invalid rule in denying medical treatment. (Am. Compl. at 15-25.) Finally, Suchodolski claims Nooth and Johnson violated his due process rights by improperly handling his grievances. (Am. Compl. at 23-25.)

Virtually all of Suchodolski's claims hinge on Defendants' reliance on the Policy, which Suchodolski alleges has been found to be invalid and unenforceable by the Oregon Court of Appeals. Suchodolski seeks punitive and compensatory damages totaling between $125,000 and $575,000 on each of his twenty-two claims, attorney fees, and injunctive relief in the form of an order directing the Department to "have a third party medical facility perform a CT scan or Ultrasound scan to allow a proper assessment and medical treatment of the Plaintiffs," and to "follow all recommendations of said third party regarding medical treatment and/or surgical repair if needed." (Am. Compl. at 26-34.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

---

[5]Suchodolski initiated this lawsuit on July 19, 2017. (Compl. ECF No. 1.)

56(a) (2018).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id*. at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).  Where different ultimate inferences may be drawn, summary judgment is inappropriate.  *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits.  A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence.  FED. R. CIV. P. 56(c) (2018).  The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

## I. The Policy

Suchodolski asserts Defendants' reliance on the Policy in denying Suchodolski's request for additional diagnostic testing and examination by another physician violated his constitutional rights under the Eighth and Fourteenth Amendments because the Oregon Court of Appeals found the Policy to be invalid in *Smith v. Dep't of Corr.*, 276 Or. App. 862 (2016), prior to Defendants' denials. Defendants contend the medical care provided to Suchodolski was proper under Oregon Administrative Regulation 192-124-0041 (the "Regulation") and any reliance on the Policy was minimal and irrelevant.

The Policy[6] sets forth "the method and guidelines used to determined whether treatment will or will not be provided by the [Department]" and mirrors, to a great degree, the Regulation. While the Policy provides a more detailed scheme than the Regulation, identifying specific factors to be considered when deciding if a treatment or service should be provided, both the Policy and the Regulation prioritize medical conditions into four levels with virtually identical definitions. Level 1 is labeled "Medically Mandatory" and is defined as care "that is essential to life and health, without

_____

[6]Neither party provided a copy of the Policy in effect in the Spring of 2017. The court obtained a copy of the current version of the Policy found on the Oregon Department of Corrections website at https://www.oregon.gov/doc/OPS/HESVC/docs/policies_procedures/Section_A/PA02.1 %20Ther%20Levels%20of%20Care%202017.pdf. When the court cites to "Policy #P-A-02.1," it is referring to this document.

which rapid deterioration may be an expected outcome and where medical/surgical intervention makes a very significant difference." OR. ADMIN. R. 192-124-0041(1)(a)(A) (2017); Policy #P-A-02.1(B)(1)(a). Level 2 is labeled "Presently Medically Necessary" and is defined as care "without which the inmate could not be maintained without significant risk of either further serious deterioration of the condition or significant reduction in the chance of possible repair after release or without significant pain or discomfort." OR. ADMIN. R. 192-124-0041(1)(b)(A); Policy #P-A-02.1(B)(2)(a). Level 3 is labeled "Medically Acceptable but Not Medically Necessary" and is defined as care "for non-fatal conditions where treatment may improve the quality of life for the patient." OR. ADMIN. R. 192-124-0041(1)(c)(A); Policy #P-A-02.1(B)(3)(a). Finally, Level 4 is labeled "Limited Medical Value" and is defined as care which may be "valuable to certain individuals but is significantly less likely to be cost effective or to provide substantial long-term improvement." OR. ADMIN. R. 192-124-0041(1)(d)(A); Policy #P-A-02.1(B)(4)(a).

With regard to Level 3, which is the level relevant to this matter, the Regulations provide "care and treatment may or may not be authorized based upon review of each case. Only the clinical director and as delegated, the chief medical officer, may authorize or deny care and treatment of Level 3 conditions." OR. ADMIN. R. 192-124-0041(1)(c)(B). On the other hand, the Policy allows the "provision of services to inmate/patients on a case[-]by[-]case basis" with acute or on-site services authorized by the chief medical officer and chronic or off-site services authorized by the Committee. Policy #P-A-02.1(A)(1)(c). The Policy lists examples of non-fatal conditions which fall within the Level 3 definition, such as "routine hernia repair, treatment of non-cancerous skin lesions, corneal transplant for cataract, hip replacement, etc." and sets forth nine factors to be considered when determining if a clinical service should be provided, such as the urgency of the

procedure and the length of the inmates remaining sentence, the necessity of the procedure, pre-existing conditions, probability of success, alternative treatments, the inmates desires, risk/benefits, costs/benefits, and pain complaints.  Policy #P-A-02.1(A)(3)(a) and (c).

In *Smith*, the plaintiff argued the Policy is properly characterized as a "rule," was not properly adopted pursuant to the Department's rulemaking authority and was, therefore, invalid.  *Smith*, 276 Or. at 869.  The court agreed, finding the Policy clarified the general criteria found in the Regulation and, consequently, qualified as a rule.  *Id*. at 873.  The court explained:

> [t]he [Regulation] defines levels of care in a manner that requires health care providers to make judgments with certain general criteria in mind.  In contrast, by adding examples to the level of care definitions, the [Policy] refines the general criteria found in the [Regulation] definitions.  The effect of the examples is to direct the health services personnel to interpret the general criteria consistent with the examples given.
>
> Similarly, by adding nine additional factors for a review committee to consider before authorizing Level 3 care, the [Policy] refines the [Regulation's] general requirement that Level 3 care be authorized on a case-by-case basis.  The result is that the committee, and even health care providers making decisions about Level 3 medical procedures, will authorize, not on a case-by-case basis as the existing [Regulation] requires, but consistent with the nine additional factors listed in the [Policy].

*Id*. at 873.  As the Policy was a rule, the Department's failure to follow rulemaking procedures in adopting the Policy made the Policy invalid and unenforceable.  *Id*. at 874.  The Regulation, which was not at issue in *Smith*, remained valid and enforceable.

There is no evidence Dr. Graham or the Committee relied on the Policy in determining Suchodolski's condition or the appropriate treatment for such condition.  The only reference to the Policy is found in the April 17, 2017 letter denying the First Appeal, where Dr. DiGiulio stated the Policy "addresses the level of therapeutic care provided by [Department] health services." (Ex. List.

Ex. 13.) He then expressly determined Suchodolski's condition fell "under the category of Level 3 'medically acceptable but not medically necessary' for which treatment is authorized on a case[-]by[-]case basis." This finding is consistent with the categories created in the Regulation and alleviates the concerns expressed by the court in *Smith* that each case be considered on a case-by-case basis as required under the Regulation.

A mere reference to the Policy in the absence of evidence Dr. DiGiulio actually considered the examples of level-of-care definitions or the nine additional factors for review found offensive by the *Smith* court does not, without more, sufficiently taint the Department's handing of Suchodolski's condition to support a constitutional claim. Moreover, Jungvirt denied the Second Appeal without referencing the Policy, thereby eliminating any possible error resulting from Dr. DiGiulio's mention of the Policy. Finally, the characterization of Suchodolski's condition as a Level 3 condition and the recommended treatment comport with the Regulation. Suchodolski fails to asserts a claim for constitutional violation based solely on the invalidity of the Policy.

## II. Eighth Amendment- Deliberate Indifference

Suchodolski alleges Medical Defendants' refusal to provide "medical treatment and further medical evaluation of [Suchodolski's] obvious defect in his right lower inguinal area" violated his Eighth Amendment rights to be free from cruel and unusual punishment. (Am. Compl. 4-14.) Medical Defendants assert Suchodolski received adequate medical care based on the symptoms presented and fails to establish Medical Defendants acted with deliberate indifference in denying the requested medical care.

The Eighth Amendment to the United State Constitution provides: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const.

amend. VIII. "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.' " *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (internal citations omitted).

Courts have spilled a great deal of ink in an attempt to define "cruel and unusual punishment" by balancing "broad and idealistic concepts of dignity, civilized standards, humanity, and decency" with the goals and necessities of punishment. *Estelle v. Gamble,* 429 U.S. 97, 102 (1976) (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)). To this end, the Supreme Court has held that punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102 (quoting *Trop v. Dulles,* 356 U.S. 86, 101 (1958)).

From these principles, the Court has determined the government has an obligation to provide medical care for prisoners in its custody. "It is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." *Estelle,* 429 U.S. at 104 (quoting *Spicer v. Williamson,* 191 N.C. 487, 490 (1926)). Thus, the government violates a prisoner's right to be free from cruel and unusual punishment by providing medical care that shows "deliberate indifference to serious medical needs of prisoners." *Estelle,* 429 U.S. at 104. However, not all failures to provide adequate medical care amount to constitutional violations. In *Estelle,* the Supreme Court reasoned:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an "unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 105–06.

Deliberate indifference is more than a mere lack of due care, but a plaintiff need not allege that prison officials acted with an intent to cause harm. *Farmer,* 511 U.S. at 835. Courts have "routinely equated deliberate indifference with recklessness." *Id.* at 836. The Supreme Court adopted the standard for "subjective recklessness as used in the criminal law" for Eighth Amendment claims based on cruel and unusual punishment, requiring evidence "the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 839-40, 842. Or in the words of the Ninth Circuit, there must be "a purposeful act or failure to act" by the prison official, despite knowledge that the official's act or failure to act will likely cause the plaintiff harm. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). When a prisoner's allegations amount only to a claim for medical malpractice, his remedy is properly sought in state court under state law. *Estelle,* 429 U.S. at 107.

To succeed on a deliberate indifference claim based on inadequate medical care, the plaintiff must show: (1) he or she suffered an objectively serious illness or injury while incarcerated; and (2) prison officials were subjectively aware of the prisoner's serious condition, but nonetheless delayed or denied access to adequate medical care. *McGuckin*, 974 F.2d at 1059-1060. The first element is met whenever "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* at 1059 (quoting *Estelle*, 429 U.S. at 104). More specifically, "[t]he existence of an injury that a reasonable doctor or patient would find

important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin,* 974 F.2d at 1059–60.

There is no evidence Medical Defendants' alleged failure to treat Suchodolski's right inguinal strain resulted in further significant injury or subjected Suchodolski to increased, substantial, or unnecessary pain. The record reveals Suchodolski's diagnosis and symptoms remained consistent during the relevant period. Dr. Graham noted on June 21, 2017, Suchodolski's right inguinal pain had been an ongoing issue since 2015 and, after reviewing chart notes, concluded Suchodolski's condition had not changed as of August 16, 2017. Consequently, the record establishes Suchodolski's condition was chronic with no evidence of additional significant injury due to lack of treatment over an extended period. While various medical providers diagnosed Suchodolski with a muscle strain, none reported evidence of anything more severe, including a hernia. Fitzpatrick specifically noted the absence of evidence of a serious medical issue in her denial of the First Grievance and Dr. Graham reassured Suchodolski in June 2017 that no change in his condition for over eight months meant nothing serious was going on.

All of the medical providers recommended Suchodolski limit or avoid weightlifting, specifically squats and deadlifts, to allow the muscle to heal and avoid further strain. However, despite his reports of pain, Suchodolski generally continued to engage in weight-lifting activities, eventually limiting only his squats and deadlifts to his own body weight. This is evidence the pain suffered by Suchodolski was not sufficiently severe to alter Suchodolski's daily activities, whether necessary or elective. Moreover, Dr. Graham found Suchodolski's muscle strain did not affect

Suchodolski's ability to "function at the capacity of the institution" or qualify Suchodolski for a bottom bunk. Suchodolski's reports of pain while lifting, bending over, doing sit ups, tying his shoes, straining while having a bowel movement, and getting out of his top bunk are not entirely inconsistent with this finding.

The court finds Suchodolski failed to offer evidence the injury of which he complained was sufficiently serious to require medical treatment. Accordingly, Suchodolski has failed to identify a serious medical need required to maintain an Eighth Amendment claim based on medical treatment. However, even assuming Suchodolski suffered from a serious injury, there is no evidence Medical Defendants acted with deliberate indifference in responding to Suchodolski's complaints.

The second element of a deliberate indifference claim based on inadequate medical care – subjective awareness of a serious condition coupled with a delay or denial of access to adequate medical care – is met "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). "A defendant is liable for denying needed medical care only if he 'knows of and disregards an excessive risk to inmate health and safety.' " *Lolli v. County of Orange*, 351 F.3d 410, 419 (9th Cir. 2003)(quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002). " 'If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk.' " *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)(quoting *Gibson*, 290 F.3d at 1188).

There is no evidence Medical Defendants intentionally failed to respond to Suchodolski's pain or medical need. Suchodolski does not allege he was not examined or treated by a medical provider in a timely manner. The record clearly establishes that every time Suchodolski sought

medical assistance, he was examined by a nurse at Snake River, and was subsequently referred to and examined by Dr. Graham four times in six months. The examinations revealed only a muscle strain; no medical provider reported evidence of a hernia. Moreover, all medical providers suggested treatment for Suchodolski's muscle strain, which advice – when followed, appeared to alleviate some of Suchodolski's pain.

Suchodolski claims Medical Defendants's refusal to order an ultrasound or CT scan or allow Suchodolski to obtain a second opinion constitutes indifference. However, Suchodolski fails to establish such tests or examination were necessary based on his complaints. Additionally, the Supreme Court has held failure to order an x-ray for an injury diagnosed as a muscle strain does not qualify as deliberate indifference.

In *Estelle*, prison doctors diagnosed an inmate with lower back strain and treated him with bed rest, muscle relaxants, and pain relievers. *Estelle*, 429 U.S. at 107. The inmate filed a complaint against the doctors, contending "more should have been done by way of diagnosis and treatment, and suggest[ing] a number of options that were not pursued." *Id*. The Fifth Circuit agreed, noting an X-ray of the lower back and other tests could have been conducted, facilitating a proper diagnosis and improved treatment for the pain. *Id*. The Supreme Court overruled, explaining:

> the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel or unusual punishment. At most it is medical malpractice, and as such, the proper forum is the state court under the Texas Tort Claims Act.

*Id*. In accordance with *Estelle*, Medical Defendants' alleged failure to conduct diagnostic testing or provide an examination by a third party at most constitutes negligence but is not deliberate indifference, and is not actionable as a violation of the Eighth Amendment.

Moreover, "a prisoner's disagreement with his or her physician regarding the appropriate course of diagnostic tests or treatment does not give rise to an Eighth Amendment claim." *Martin v. Dewsnup*, No. 6:11-cv-06420-AC, 2015 WL 13730889, at *10 (D. Or. Dec. 30, 2015)(citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). "A mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.' Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.' " *Toguchi*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996))(internal citation omitted). While Suchodolski claims Medical Defendants should have engaged in diagnostic testing and provided Suchodolski a second opinion, Suchodolski has not offered evidence the treatment provided was medically unacceptable under the circumstances. Consequently, Suchodolski has offered a mere difference of opinion on the proper treatment of his muscle strain, which is not actionable under the Eighth Amendment.

Finally, there is no evidence Suchodolski suffered harm as a result of Medical Defendants' failure to conduct the requested tests or provide a second examination. The only possible harm suffered by Suchodolski was continued pain and resulting anxiety. Medical Defendants found Suchodolski's condition was related to, if not caused by, his weightlifting activities, and consistently recommended Suchodolski refrain from such activities. Suchodolski's representation he missed his doctor's appointment in late 2016 because his "pain and discomfort slowly [receded] and seemingly became tolerable" is evidence the recommended treatment was appropriate and beneficial. (Suchodolski Decl. ¶¶ 9-11.) Suchodolski's subsequent failure to follow the recommended treatment

was likely pivotal in preventing the improvement of Suchodolski's condition, not Medical Defendants' failure to provide diagnostic testing, which was not indicated by Suchodolski's symptoms in any event.

Suchodolski failed to establish he suffered from a serious medical condition, that Medical Defendants deliberately refused to provide proper treatment for such condition, or that the lack of proper treatment resulted in harm to Suchodolski. Consequently, Suchodolski has not supported his claim for violation of his Eighth Amendments rights and Medical Defendants are entitled to summary judgment on his First through Tenth Claims for Relief.

## III. Fourteenth Amendment-Due Process

In his Eleventh through Nineteenth Claims for Relief, and his Twenty-First Claim for Relief, Suchodolski claims Due Process Defendants violated his rights to due process by basing the denial of medical treatment on the Policy, which had not been adopted through proper rule-making procedures. In his remaining two claims, Suchodolski asserts Nooth and Johnson violated the grievance process, thereby denying Suchodolski of his right to receive a proper administrative remedy. It appears from the allegations Suchodolski is asserting a procedural due process claim with regard to both the Policy and the grievance procedure. Alternatively, Suchodolski could be asserting a substantive due process claim. Defendants move for summary judgment on these claims arguing Suchodolski has failed to identify a right or interest protected by the Fourteenth Amendment.

### A. Procedural Due Process

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The base requirement of the Due Process Clause is that a person deprived of property be given an opportunity to be heard "at

a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). To invoke the procedural protection offered by the Due Process Clause, a plaintiff must establish three elements: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. Cnty. of Santa Clara,* 995 F.2d 898, 904 (9th Cir. 1993).

Suchodolski fails to identify the liberty or property interest protected by the Constitution. Assuming a right to medical care is a protected interest, such interest is limited to a deliberately indifferent denial of care. The court has found Medical Defendants did not act with deliberate indifference, defeating Suchodolski's procedural due process claim based on medical care. If Suchodolski relies on the invalid Policy, such claim is defeated by the determination the Medical Defendants did not rely on the Policy in determining the appropriate treatment for Suchodolski's condition. Finally, Suchodolski fails to establish Nooth or Johnson violated the grievance process or that such alleged violation deprived Suchodolski of a protected liberty or property interest. Suchodolski has failed to establish the elements essential to his procedural due process claim.

### B. *Substantive Due Process*

The Fifth and Fourteenth Amendments' guarantee of "due process of law" are interpreted to have a substantive component. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (emphasis in original). The substantive component "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id*. at 302. To establish a violation of substantive due process for a Section 1983 claim, "a plaintiff is ordinarily required to prove that a challenged government action was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety,

morals, or general welfare.'" *Patel v. Penman*, 103 F.3d 868, 874 (9th Cir. 1996) (quoting *Euclid v. Amber Realty Co.*, 272 U.S. 365, 395 (1926)) (overruled on other grounds by *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086 (9th Cir. 2007)).  Only official conduct that " 'shocks the conscience' and violates the 'decencies of civilized conduct' " is cognizable as a due process violation.  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)(quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).

Again, Suchodolski has failed to identify the fundamental liberty interest at stake.  To the extent he bases his substantive due process claim on the denial of his right to medical care, the court has found Defendants did not act with deliberate indifference with regard to such denial.  Consequently, the official conduct on which Suchodolski relies does not shock the conscience or violate the decencies of civilized conduct.

Moreover, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Lewis*, 523 U.S. at 842 (citations omitted).  Here, Suchodolski's claim the Due Process Defendants violated his right to substantive due process is without merit because Suchodolski's allegations are properly analyzed under the Eighth Amendment.  Suchodolski alleges deliberate indifference by the prison officials to a serious risk of harm to himself, which falls within the Eighth Amendment's guarantee against cruel and unusual punishments.  Because Suchodolski is protected against the harms he alleges by the Eighth Amendment, his claim for violation of his right to substantive due process based on deliberate indifference is without merit.

Defendants alternatively move for summary judgment based on the Eleventh Amendment,

qualified immunity, discretionary immunity, and the absence of personal involvement required to impose respondeat superior liability under Section 1983. Because the court finds Suchodolski failed to offer facts establishing a violation of rights under the Eighth Amendment or the Fourteenth Amendments, the court need not, and will not, address Defendants' alternate arguments.

*Conclusion*

Defendants' motion (ECF No. 29) for summary judgment is GRANTED and Suchodolski's motion (ECF No. 21) is DENIED.

DATED this 10th day of October, 2018.


 /s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge